**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Kevin McKenzie,

    *Plaintiff,*

v.

Progressive Treatment Solutions, LLC,
*et al.,*

    *Defendant.*

No. 25 CV 1768

Judge Lindsay C. Jenkins

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kevin McKenzie brings this putative class action, alleging that a cannabis product he purchased was misclassified, and therefore unsafe and worthless as sold. He raises claims for fraud, breach of warranty, and unjust enrichment against three defendants, who together manufacture, market, label, and package the product. Before the court is Defendants' collective motion to dismiss, which the court grants for failure to state a claim.

## I.    Background[1]

Illinois passed the Cannabis Regulation and Tax Act (CRTA) in 2019, legalizing and regulating the sale and recreational use of cannabis. [Dkt. 41, ¶ 47.] The CRTA permits two classes of cannabis products to be manufactured and sold: smokeable products and cannabis-infused products (CIPs). [*Id.*, ¶¶ 64, 66.] This follows from the statutory definition of "cannabis-infused product," which includes a catch-all that excludes only cannabis concentrates not intended to be smoked:

> *"Cannabis-infused product"* means a beverage, food, oil, ointment, tincture, topical formulation, *or another product containing cannabis or cannabis concentrate that is not intended to be smoked.*

[*Id.*, ¶ 65 (citing 410 ILCS 705/1-10 (emphasis in complaint)).]

To protect consumers, Illinois limits the amount of cannabis that can be possessed or sold. [*Id.*, ¶ 78.] For example, Illinois residents may possess no more than five grams of THC in (smokeable) cannabis concentrates, or 500 milligrams in

---

[1]    The court accepts as true plaintiff's well-pleaded allegations and draws all reasonable inferences in his favor. *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 522 (7th Cir. 2023).

CIPs. [*Id.*, ¶ 79 (410 ILCS 705/10-10(2)).] The single-package limit for a CIP is 100 milligrams. [*Id.*, ¶ 74 (citing 410 ILCS 705/55-21(k)).]

In July 2024, Plaintiff Kevin McKenzie purchased a one-gram Freddy Pebbles Mozey disposable vape cartridge ("the Product"), a cannabis product featuring upwards of 74% THC. [Dkt. 41, ¶¶ 123–24, 126.] Defendants Progressive Treatment Solutions, NMI Management, and PTS Corp.[2] produce and market the Product, which McKenzie purchased from Sunnyside Dispensary in Rockford, Illinois. [*Id.*, ¶¶ 21–23, 35–41, 124–25.]

Prior to purchasing, McKenzie reviewed the Product's label and packaging,[3] which indicated to him that it "complie[d] with lab testing, labeling, and safety requirements, and otherwise [was] a compliant product." [*Id.*, ¶ 130.] It represented the product amount (one gram) and potency, that "smoking is hazardous to your health," and an onset time of "1-15 minutes." [*Id.*, ¶¶ 99, 126, 139.] The amount and potency are together permissible only for smokeable products, and the "1-15 minute" onset advisory is inconsistent with the "2 or more hours" warning required for CIPs. [*Id.*, ¶¶ 97, 104.]

He thus understood the Product to be a non-CIP concentrate, legal and safe in the amount sold. [*Id.*, ¶¶ 130–31, 140–42.] But this, he says, is deceptive. [*Id.*, ¶¶ 11–16, 106.] Under the CRTA, smoking requires combustion—and combustion, he alleges, is not required for vaping. [*Id.*, ¶¶ 65, 67–69.] He therefore reasons that the Product is accurately classified as a CIP and, consequently, improperly and unsafely sold at one gram. [*Id.*, ¶¶ 91–95, 106.]

McKenzie, however, does not allege suffering or expecting to suffer any adverse health effects. In fact, he doesn't allege having even used the Product. Rather, he believes it worthless, alleging harm only "in the full amount of monies paid." [*Id.*, ¶¶ 145, 194.] He now raises six claims—for violating the Illinois Consumer Fraud Act (ICFA), common law fraud, fraudulent concealment, breach of express warranty, breach of implied warranty, and unjust enrichment.

## II.    Legal Standards

A motion to dismiss pursuant to Rule 12(b)(1) challenges the court's subject-matter jurisdiction, while a motion to dismiss under Rule 12(b)(6) tests the legal

---

[2]    The complaint alleges that these companies are "functionally one entity" and share "such a unity of interest and ownership that the separate personalities … no longer exist." [Dkt. 41, ¶¶ 21–25; 35, 38–41.] For this reason, the court permits group pleading over Defendants' protests. *See Brooks v. Ross*, 578 F.3d 574, 582 (7th Cir. 2009) (permitting group pleading when directing allegations "at all of the defendants").

[3]    He also discusses website marketing and says he considered descriptions on the dispensary ordering platforms. [*Id.*, ¶¶ 127–28.]

sufficiency of the plaintiff's claims. In both cases, the court takes well-pleaded factual allegations as true and draws reasonable inferences in the plaintiff's favor. *Reardon v. Danley*, 74 F.4th 825, 827 (7th Cir. 2023); *Choice v. Kohn L. Firm*, S.C., 77 F.4th 636, 638 (7th Cir. 2023).

At the pleading stage, the court evaluates only whether the factual allegations "plausibly suggest" the existence of subject-matter jurisdiction under the familiar *Iqbal–Twombly* standard. *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015). *See also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Then, to survive a motion to dismiss under Rule 12(b)(6), "a complaint's factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Emerson v. Dart*, 109 F.4th 936, 941 (7th Cir. 2024) (quoting *Twombly*, 550 U.S. at 555 (2007)). Rule 9(b) further requires parties to plead fraud with particularity. Ordinarily, this includes the "who, what, when, where, and how of the fraud—the first paragraph of any newspaper story." *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (internal citation and quotation marks omitted).

## III.  Analysis

Defendants have moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that McKenzie lacks standing and, regardless, failed to state a claim for relief. Considering standing first, as it must, *see Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 461 (7th Cir. 2020), the court concludes McKenzie alleged a financial injury and may pursue claims for products he purchased. However, it agrees with Defendants that he failed to state any claim for relief, and so grants their motion without prejudice.

### A.  Rule 12(b)(1)

Defendants first argue that McKenzie lacks standing, both to pursue his claims generally, and—more narrowly—to sue for products he did not himself purchase. [Dkt. 44, at 12, 14.[4]] Consistent with Article III's limitation of federal court jurisdiction to "cases and controversies," plaintiffs must have standing to pursue their cases. *Pucillo v. Nat'l Credit Sys., Inc.*, 66 F.4th 634, 637 (7th Cir. 2023). To establish standing, "the plaintiff must have suffered an injury in fact traceable to the defendant and capable of being redressed through a favorable judicial ruling." *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "The alleged injury must be 'concrete and particularized' as well as 'actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan*, 504 U.S. at 560).

---

[4]     Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

While the court agrees with McKenzie that the financial injury alleged is sufficient to confer standing as a general matter, it will not permit him to "acquire[]" it for products not purchased "through the back door of a class action." *Payton v. Cnty. of Kane*, 308 F.3d 673, 682 (7th Cir. 2002) (quoting *Allee v. Medrano*, 416 U.S. 802, 828–29 (1974) (Burger, C.J., dissenting)).

### 1. Injury in Fact

McKenzie purchased products containing what he believed to be safe quantities of THC. [Dkt. 41, ¶¶ 130–31.] He says, however, that instead of purchasing a cannabis concentrate—as suggested by the packaging and marketing, and safe under the circumstances—he *actually* purchased a CIP. [*Id.*, ¶ 1.] And CIPs with that much THC are unsafe and, consequently, worthless. [*Id.*, ¶¶ 136, 145.] Had he not been misled, then, he "would not have purchased these Vapable Oils," *id.*, ¶ 143, so he reasons that he experienced a "financial injury for the full amount paid." [Dkt. 45, at 10.]

"A financial injury creates standing." *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 751 (7th Cir. 2011). More specifically, McKenzie's theory—of, in short, informed buyer's remorse—has been adopted by courts when "the product itself [is] defective or dangerous and consumers claim they would not have bought it (or paid a premium for it) had they known of the defect." *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 968 (7th Cir. 2016). *Aqua Dots* is one such case. *See* 654 F.3d at 751 (observing that "plaintiffs' loss [was] financial: they paid more for the toys than they would have, had they known of the [health] risks the beads posed to children").

Defendants, however, insist that with *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 530 (7th Cir. 2024), the Seventh Circuit so distinguished *Aqua Dots* as to thwart McKenzie's theory of standing. [Dkt. 44, at 12–13.] True, *Abbott* did narrow *Aqua Dots*, removing from its sweep cases involving mere risks of defects, as opposed to "*universal* defect[s] inherent in a product—such as a design defect or a fundamental flaw—render[ing] each product valueless to each plaintiff." *Id.* at 530 (emphasis added). But McKenzie alleges that the purchased products suffered not a potential flaw, but a fundamental and universal one, and so *Aqua Dots*, not *Abbott*, is apposite.

Indeed, in *Abbott*, unsanitary conditions at an isolated manufacturing facility put infants at risk of illness. *Id.* at 527. But the plaintiffs did not plead that the products they purchased were among those exposed, and so the Seventh Circuit rejected any analogy to *Aqua Dots*, concluding that "potential risk of contamination is not enough to confer standing." *Id.* at 530 (distinguishing it from *Aqua Dots*, where *every* "toy contained the toxic adhesive"). From this, Defendants argue that *Abbott* holds "that a future potential risk of injury is insufficient to confer standing." [Dkt. 44, at 10.] Not so. It was the mere risk of *contamination*, not *injury*, that proved dispositive—and which distinguished it from *Aqua Dots*. Put differently, the theory

4

holds only when a consumer is *necessarily* at risk of future harm. Such is true for McKenzie, because the (allegedly) safety-undermining-misrepresentation is common across all units of the product. [*See* Dkt. 41, ¶ 194 (describing the Product as necessarily dangerous).]

Defendants also argue that *Tepper v. The Quaker Oats Company,* 2025 WL 843710 (N.D. Ill. Mar. 18, 2025), "distinguished *Aqua Dots* on the grounds that it involved products with ingredients that were harmful 'at any level.'" [Dkt. 49, at 4.] *Tepper,* it says, explained that "consumers only have standing where a product ingredient is dangerous at 'any level,'" which THC is not. [Dkt. 44, at 8.] Again, this misunderstands the caselaw.

*Tepper* fits neatly within the as-discussed *Aqua Dots–Abbott* framework. It concerned the "presence of chlormequat in certain oat-based foods"—specifically in amounts "*significantly below* the tolerance level set by the EPA." *Tepper*, 2025 WL 843710, at *1, 4. In other words, "the levels … were safe," and so there was no risk of future harm. *Id.* at *4. If no amount was safe, i.e., if the presence of a contaminant guaranteed harm "at any level," it would demand a different result.[5] *Id.*; *see also In re Recalled Abbott Infant Formula Prod. Liab. Litig.*, 2023 WL 3585759 (N.D. Ill. May 22, 2023) (discussing always-unsafe heavy metal presence in infant formula). But so too if the amount *exceeded* an established safety level. The latter is precisely what McKenzie alleges here, and why Defendants' reliance on *Tepper*'s "any level" commentary misses the mark.

Still, the appeal of *Tepper* is understandable. There, the court observed that "Plaintiffs' allegations about the harm that chlormequat poses to humans is hypothetical." *Tepper*, 2025 WL 843710, at *4 (citing *Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010), which rejected plaintiff's "subjective allegation that the trace amounts of lead in the lipsticks are unacceptable"). *But see Castillo v. Unilever United States, Inc.*, 2022 WL 704809, at *3 (N.D. Ill. Mar. 9, 2022) ("Pressing the contrary result, Unilever insists that DMDM hydantoin is safe. … Maybe so, but at the pleading stage, the court must accept Plaintiffs' allegations that DMDM hydantoin, and thus the TRESemmé products containing that ingredient, are unsafe.") The same might be said of McKenzie's allegations, since the dangers he identifies follow from a classification that he, and only he, insists upon. But it's not for this court to say so definitively—not at the pleading stage, and not when McKenzie's allegations of harm follow from an intelligible and objective exercise in syllogism and statutory interpretation. *See infra* Part III.B.1.

McKenzie has therefore pled a cognizable financial injury. He spent money on a seemingly safe product that, he alleges, turned out to be fundamentally flawed and necessarily unsafe. That suffices for standing.

---

[5]     Assuming universal contamination.

### 2. Standing to Sue for Unpurchased Products

McKenzie, however, only has standing to sue for the product he purchased: a one-gram Freddy Pebbles Mozey disposable vape cartridge. [Dkt. 41, ¶ 124.] He attempts otherwise, purporting to raise claims concerning "any Vapable Oils containing more than 100mg of THC that were manufactured, processed, made, labeled, and/or packaged by Defendants." [*Id.*, ¶ 148.]

Courts in this district take one of three approaches to this issue. Some "categorically hold that class action plaintiffs never have standing with respect to products they have not purchased." *Gibson v. Albertsons Companies, Inc.*, 754 F. Supp. 3d 793, 803 (N.D. Ill. 2024). *See also Bakopoulos v. Mars Petcare US, Inc.*, 2021 WL 2915215, at *3 (N.D. Ill. July 12, 2021). Others permit plaintiffs to move forward when "the products and alleged misrepresentations about a purchased product are substantially similar." *Wagner v. Gen. Nutrition Corp.*, 2017 WL 3070772, at *5 (N.D. Ill. July 19, 2017) (quoting 1 McLaughlin on Class Actions § 4.28 (13th ed. 2016)). *See also Ulrich v. Probalance, Inc.*, 2017 WL 3581183, at *6 (N.D. Ill. Aug. 18, 2017). Finally, some "distinguish[] between Article III standing and class-certification requirements," deferring resolution until certification. *Daly v. FitLife Brands, Inc.*, 2023 WL 6388112, at *6 (N.D. Ill. Sept. 29, 2023). *See also Texas Hill Country Landscaping, Inc. v. Caterpillar, Inc.*, 522 F. Supp. 3d 402 (N.D. Ill. 2021). There is no controlling authority, and the Supreme Court has observed a tension in its own caselaw as to whether similar questions are "appropriately addressed under the rubric of standing or adequacy." *Gratz v. Bollinger*, 539 U.S. 244, 263 n.15 (2003).

McKenzie asks this court to follow the second or third approach. [Dkt. 45, at 11–12.] This court, however, has twice endorsed the first. *See Waggener Van Meter v. Mondelez Int'l, Inc.*, 2025 WL 3678444, at *5–6 (N.D. Ill. Dec. 18, 2025); *Raya v. Mead Johnson Nutrition Co.,* 758 F. Supp. 3d 819, 829 (N.D. Ill. 2024). As it explained in *Raya,* plaintiffs have "the burden of establishing standing throughout the case 'with the manner and degree of evidence required at the successive stages of litigation.'" *Id.* (quoting *Lujan*, 504 U.S at 561). At this stage, "there is no class and plaintiff cannot bypass the 'irreducible constitutional minimum' of Article III standing for her individual claim." *Sanchez v. Walmart Inc.*, 733 F. Supp. 3d 653, 665 (N.D. Ill. 2024) (quoting *Lujan*, 504 U.S. at 560).

Therefore, McKenzie's claims for products he did not purchase are dismissed without prejudice for lack of standing.

### B. Rule 12(b)(6)

McKenzie alleges that, by producing and marketing the Product as if it weren't a CIP, Defendants committed fraud, breached warranties, and were unjustly enriched. But because the alleged misrepresentation is one of law, he cannot maintain either a common law or statutory fraud action—and so the derivative unjust

enrichment claim fails, too. Nor has he identified an express warranty that Defendants breached, or, for that matter, has he alleged contractual privity (or a limited exception), as is necessary for his warranty claims to survive.

### 1.    McKenzie's Theory of Deception

McKenzie's allegations, which are vast, are at times digressive and often repetitive. So, the court thinks it helpful to summarize its understanding of his theory of the case:

The CRTA divides cannabis products into smokeable products and CIPs. [Dkt. 41, ¶¶ 64–66 (citing 410 ILCS 705/1-10).] Safety regulations limit the amount of THC in CIPs, but not smokeable products, to 500 milligrams possessed (among Illinois residents) and 100 milligrams sold (in a single package). [*Id.*, ¶¶ 74, 79 (citing §§ 705/55-21(k), 705/10-10(2)).] Anything exceeding these thresholds, then, is either (1) smokeable or (2) unsafe.

Defendants, meanwhile, sell the Product in above-CIP amounts and without CIP warnings. [*Id.*, ¶¶ 96–104.] They also hold themselves out to consumers as licensed and compliant cannabis companies. [*Id.*, ¶ 140.] Therefore, consumers expect the Product to be smokeable—not unsafe. [*Id.*]

But the CRTA defines "smoking" as the "inhalation of smoke caused by the combustion of cannabis." [*Id.*, ¶ 65 (quoting § 705/1-10).] [*Id.*, ¶ 65 (quoting § 705/1-10).] Vaping, which involves heating, does not require combustion, which involves burning. [*Id.*, ¶¶ 68, 84–86.] Thus, the Product is not smokeable and, necessarily, a CIP. [*Id.*, ¶ 91.]

Therefore, contrary to consumer expectations, the Product—sold in amounts and potencies exceeding the safe threshold for CIPs—is unsafe. [*Id.*, ¶ 106.] All else follows from this.

Defendants respond with three threshold arguments, each applicable to all claims. First, they argue that the Product already contains a state-mandated safety warning. [Dkt. 44, at 15.] But this argument is insufficient against McKenzie's theory of the case. If, as he alleges, the Product is a CIP, the CRTA requires additional warnings.[6] Regardless, the crux of his case is deception—not that the Product's warnings were insufficient.

---

[6]    "Cannabis-infused products (other than those intended for topical application) must contain a statement 'CAUTION: This product contains cannabis, and intoxication following use may be delayed 2 or more hours. This product was produced in a facility that cultivates cannabis, and that may also process common food allergens.'." 410 ILCS 705/55-21(j)(2).

Second, and related, Defendants insist that McKenzie's claims are implausible because (1) he cannot realistically claim he was "unaware of the potential health risks associated with high-potency cannabis products," and (2) there is no risk of future harm once "well-aware of the alleged risks." [Dkt. 44, at 17–18.] But he doesn't plead ignorance of the general health risks of high-potency cannabis—only of the mis- or un-represented dangers of this Product, specifically, which rendered it valueless as sold. Moreover, he does not allege that the Product will harm him, but that he was misled into spending money on something entirely worthless.

More apt is Defendants' third argument—that McKenzie's entire theory of deception rests a flawed premise. [*Id.*, at 22.] They argue that the Product *is* a smokeable concentrate under the CRTA, disputing the definitions of "smoking" and "combustion" upon which he relies. [*Id.*, at 19–21.]

The parties agree that, under the CRTA, smoking involves "the inhalation of smoke caused by the combustion of cannabis." § 705/1-10. [*See* Dkt. 41, ¶ 65; Dkt. 44, at 19.] But they submit competing Merriam-Webster dictionary definitions of "combustion"; McKenzie cites the first: "an act or instance of burning," while Defendants favor the second: "a usually rapid chemical process (such as oxidation) that produces heat and usually light." *Combustion*, Merriam-Webster, www.merriamwebster.com/dictionary/combustion. [*See* Dkt. 45, at 16; Dkt. 44, at 19.] So, if the Product's classification turns on a dictionary definition, there's support either way.

Defendants also point the court to two other definitions of "smoking," each of which is more expansive than McKenzie's. The Illinois Department of Revenue, pursuant to its taxing authority under the CRTA, defines "smoking" as "changing cannabis from a hard, soft, or liquid form by combustion, heat, electricity, or batteries into a form that can be inhaled by the user." 86 Ill. Admin. Code 423.105. The Smoke Free Illinois Act, meanwhile, explicitly includes in its definition "the use of an electronic cigarette." 410 ILCS 82/10.

McKenzie challenges the relevance of these, instead asking the court to weigh an Illinois Department of Agriculture notice stating,

> Oil vape cartridges can be considered "cannabis-infused products" under the CRTA since vaping would not generally be considered "smoking", so long as combustion is not required to vaporize the "cannabis-infused product".

[Dkt. 41, ¶ 69 (citing Ill. Dept. Ag. CA-2022-09-INF Infusers and Vape Cartridges); Dkt. 45, at 17–18.]

Though recognizing that McKenzie's case collapses if the Product is, in fact, considered smokeable, the court declines to decide between the parties' competing

interpretations, finding dismissal warranted and more appropriate on other grounds. It therefore turns its attention to McKenzie's fraud and contract claims in turn, and to Defendants' arguments for dismissing them.

### 2.    Fraud Claims

McKenzie alleges that, following from his theory of deception, Defendants violated the ICFA and committed both common law fraud and fraudulent concealment. The claims fail for a simple reason: in Illinois, "misrepresentations or mistakes of law cannot form the basis of a claim for fraud." *McIntosh v. Walgreens Boots All., Inc.*, 2019 IL 123626, ¶ 39 (collecting cases and applying this holding in an ICFA action); *Rodriguez v. Cresco Labs, Inc.*, 2025 WL 3215872, at *4 (N.D. Ill. Nov. 18, 2025) (dismissing fraud claims in a near-identical cannabis action on this basis). The Illinois Supreme Court observed in *McIntosh* that, when a "misrepresentation of law is discoverable by the plaintiff in the exercise of ordinary prudence, it cannot form the basis of an action for fraud." *Id.* It also observed that "erroneous conclusion[s] of the legal effect of known facts constitute[] a mistake of law," and so cannot be fraudulent because "all persons are presumed to know the law." *Id.*

McKenzie does not allege that the Product misrepresented its contents, its potency, or its efficacy—in fact, given his syllogistic approach for concluding that the Product is worthless, his claims depend on these representations being true. Rather, he alleges that Defendants only "misrepresented that their Vapable Oils were cannabis concentrates and concealed that they were CIPs when, in fact, they are CIPs." [Dkt. 41, ¶ 11.] As should be clear from the foregoing gloss of his theory of the case, and of the parties' conflicting interpretations of "smoking" and "combustion," the delineation is a legal one. *See People v. Casas*, 2017 IL 120797, ¶ 17 ("construction of a statute is a question of law"); *McIntosh*, 2019 IL 123626, ¶ 40 ("representation would be one of law, constituting [defendant's] understanding and interpretation of what [] ordinance required"). Indeed, if the CRTA *does* consider vaping to be smoking, or if it *does* regard the underlying process as involving combustion—which, by McKenzie's own admission, requires one to parse both statutory and dictionary definitions—then Defendants neither misrepresented nor concealed anything, period.[7]

McKenzie disagrees, arguing that Defendants misrepresented material facts. But what facts? *Only* if the CRTA does not contemplate vaping within its definition of smoking is (a) the product unsafe, (b) the warning insufficient, (c) the cautioned "onset time" incorrect,[8] or (d) the classification false. And, to be sure, Defendants do

---

[7]    Defendants also argue that McKenzie failed to allege a misrepresentation. To the extent they did represent or conceal anything, its truth turns entirely on legal construction, and so the court thinks it easier to dismiss on the foregoing basis.

[8]    Moreover, McKenzie does not allege that the Product's *actual* onset time is "2 or more hours," rather than "1-15 minutes," only that CIPs must advise of the former. [Dkt. 41, ¶ 104.]

not misrepresent or conceal that the Product is a Vapable Oil; McKenzie concedes that Defendants market and present their products as "vapes, vape pens, vapes, cartridges, or vaporizers." [Dkt. 41, ¶¶ 5, 90.] He takes issue only with the lack of "mention or clarification that they are, in fact, CIPs." [*Id.*, ¶ 90.] This is nothing more than him challenging Defendants' application of CRTA labels and definitions to known facts.

Finally, McKenzie argues that Defendants' misrepresentations and omissions were in their "exclusive control." [Dkt. 45, at 18–19 (citing *Randels v. Best Real Est., Inc.*, 612 N.E.2d 988 (Ill. App. Ct. 1993), which observed that the fact-versus-law designation depends on what's "discoverable through the exercise of ordinary prudence by the plaintiff," and whether "the defendant misrepresents or omits facts of which he possess[es] almost exclusive knowledge").] He says Defendants possessed "exclusive knowledge about the true safety, quality, and proper use of their own Vapable Oils," as well as their own intent—which together, "are what govern the categorization of the product and its safety profile." [Dkt. 41, ¶ 244; Dkt. 45, at 19.] But this is belied by his own complaint, which—repetitively, and in detail— documents how Vapable Oils function, and then applies that understanding to argue that they are CIPs. [*See* Dkt. 41, ¶¶ 68–69, 81–86, 92–95.] He does this based on public websites, compliance notices, and Defendants' own marketing. [*See id.*] Indeed, he carefully notes that Defendants market their products as "an alternative to smoking," and that their marketing "uniformly and expressly stat[es] that their Vapable Oils are intended to be vaporized – <u>not smoked</u>." [*Id.*, ¶¶ 93–94 (emphasis in original).] How, then, can he say that he could not discover the facts which determine the Product's classification? He cannot.

Common law fraud, fraudulent concealment, and violations of the ICFA all require the misrepresentation (or concealment) of a material *fact*—or a misrepresentation undiscoverable in the exercise of ordinary prudence. *See Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*, 897 F.3d 797, 805 (7th Cir. 2018); *McIntosh*, 2019 IL 123626, ¶ 40 ("alleged misrepresentation … cannot form the basis of a claim for statutory consumer fraud"). Having failed to allege one, McKenzie's fraud claims cannot survive a motion to dismiss.

### 3. Contract Claims

McKenzie also sues in contract, alleging first that Defendants breached both express and implied warranties. The former requires a plaintiff to "allege that the seller: (1) made an affirmation of fact or promise; (2) relating to the goods; (3) which was part of the basis for the bargain; and (4) guaranteed that the goods would conform to the affirmation or promise." *O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 714 (N.D. Ill. 2020). The latter claim requires him to allege "(1) a sale of goods (2) by a merchant of those goods, and (3) the goods were not of merchantable quality." *Brandt*

*v. Boston Scientific Corp.*, 792 N.E.2d 296, 299 (Ill. 2003).[9] The claims fail for several reasons.

First, "the language of the warranty itself is what controls and dictates" the scope of an express warranty. *Rosenstern v. Allergan, Inc.*, 987 F. Supp. 2d 795, 805 (N.D. Ill. 2013) (citing *Medline Indus., Inc. v. Ram Med., Inc.,* 892 F.Supp.2d 957, 968 (N.D. Ill. 2012)). McKenzie argues that "Defendants specifically warrant that 'their Vapable Oils were safe, effective, and appropriately dosed, and did not contain any undisclosed risks." [Dkt. 45, at 27.] His more specific allegations clarify that these are all assumptions that follow from the Product's mere inclusion of safety warnings, onset advisories, and dosage. [*See id.*, ¶ 131 ("relied on these images and descriptions insofar as they *portrayed* themselves as safe to consume, safe to use in the manner marketed") (emphasis added).] In other words, it does not appear as though Defendants explicitly said that the Product was "safe, effective, and appropriately dosed." Only that it contained one gram's worth of oils, had an onset time of 1-15 minutes, and expressed that "smoking is hazardous to your health." [*Id.*, ¶¶ 97–104.] None of this is alleged to be false, just inconsistent with statutory requirements for CIPs. That's insufficient for a breach-of-express-warranty claim, which requires that the goods not conform to *the label*, not the law.

Second, Illinois requires privity of contract for breaches of both express and implied warranties. *Manley v. Hain Celestial Grp., Inc.*, 417 F. Supp. 3d 1114, 1121, 1125 (N.D. Ill. 2019) (citing *Szajna v. General Motors Corp.*, 503 N.E.2d 760 (Ill. 1986) and *Collins Co., Ltd. v. Carboline Co.*, 532 N.E.2d 834 (Ill. 1988)); *Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 525 (7th Cir. 2003). "The privity requirement means that 'only the immediate seller can be sued.'" *Gurrola v. Ford Motor Co.*, 774 F. Supp. 3d 959, 974–75 (N.D. Ill. 2025) (quoting *Ali v. Volkswagen Grp. of Am., Inc.*, 559 F. Supp. 3d 723, 733–34 (N.D. Ill. 2021)). McKenzie does not dispute this, nor does he meaningfully challenge that, having purchased the Product from Sunnyside Dispensary, *see* dkt. 41, ¶ 124, he was not in privity with Defendants. [*Id.*, ¶¶ 263, 293.] Rather, he identifies exceptions to the privity requirement that he says permit his claims. [Dkt. 45, at 28.]

He first cites the direct-dealing exception as discussed in *Rosenstern,* which observed that "[i]n the context of a buyer purchasing a product from a dealer and not the manufacturer, Illinois courts have concluded that brochures, documents, and advertisements may be the basis of express warranty." 987 F. Supp. 2d at 805 (quoting *Canadian Pac. Ry. Co. v. Williams–Hayward Protective Coatings*, 2005 WL 782698 at *15 (N.D. Ill. Apr. 6, 2005)). "In other words, manufacturer documents given directly to the buyer prior to a purchase may give rise to an express warranty

---

[9] McKenzie does not specify whether he is alleging a breach of the implied warranty of merchantability or the implied warranty of fitness for a particular purpose. However, the latter involves a peculiar, non-ordinary use of a product, which is not alleged here. *Bay Valley Foods, LLC v. FFI Grp., LLC*, 803 F. Supp. 3d 666, 687 (N.D. Ill. 2025).

because the assertions become part of the basis of the bargain unless clear affirmative proof shows otherwise." *Id.* Courts have also considered the exception in the context of implied warranties, though have expressed significant skepticism that "Illinois permits *any* exception to the vertical privity requirement for breach of implied warranty." *Gurrola*, 774 F. Supp. 3d 959, 975 (N.D. Ill. 2025) (citing *Caterpillar, Inc. v. Usinor Industeel*, 393 F. Supp. 2d 659, 678 (N.D. Ill. 2005).

McKenzie's argument is unavailing. He says that Defendants made "direct statements … in their marketing, labeling, warnings, instructions, and packaging." [Dkt. 41, ¶¶ 263, 293.] But the direct-dealing exception traces back to a 1966 case involving a "buyer [who] had dealt with the manufacturer directly as to the design of the product." *Manley*, 417 F. Supp. 3d at 1123–24 (discussing *Rhodes v. Pharmacal Co. v. Continental Can Co.*, 219 N.E.2d 726 (Ill. App. Ct. 1966)). Though some courts have held that advertising creates such a relationship, *see, e.g.*, *Elward v. Electrolux Home Prod., Inc.*, 214 F. Supp. 3d 701 (N.D. Ill. 2016), many have "declined to follow *Elward*'s relatively loose formulation of the direct-dealing exception." *Gurrola*, 774 F. Supp. 3d at 976; *Miller v. Emerson Elec. Co.*, 2025 WL 964905, at *5 (N.D. Ill. Mar. 31, 2025) ("website representations, warranties, owner's manuals, labeling and marketing … are just the ordinary general communications between manufacturers and consumers, not specific, direct communications"); *Redmon v. Whirlpool Corp.*, 2020 WL 9396529, at *5 (N.D. Ill. Apr. 28, 2020) ("unpersuaded the Illinois Supreme Court would conclude that such materials alone give rise to 'direct dealings'"); *In re VTech Data Breach Litig.*, 2018 WL 1863953, at *5 (N.D. Ill. Apr. 18, 2018) (same); *Schwebe v. AGC Flat Glass N. Am., Inc.*, 2013 WL 2151551, at *4 (N.D. Ill. May 16, 2013) (reading "exception narrowly to apply to cases where the component manufacturer knows the identity of the manufacturer's customer"). This court likewise declines to recognize such a broad exception here—particularly as it relates to passive website advertising, *see* dkt. 41, ¶ 250, or as it concerns implied warranties—or else the exception might swallow the rule. *See Schwebe*, 2013 WL 2151551, at *4 ("[t]o read the exception as broadly as [plaintiffs] desire would insert a chasm into the privity requirement").

McKenzie also cites the third-party beneficiary exception to the privity requirement, which applies "where the manufacturer knew the identity, purpose and requirements of the dealer's customer and manufactured or delivered the goods specifically to meet those requirements." *Elward*, 214 F. Supp. 3d 701 (N.D. Ill. 2016). To succeed, though, he must "plausibly allege that" Defendants knew *his* identity, and not "just the *general* identity, purpose, and requirements for consumers *en masse*." *Miller*, 2025 WL 964905, at *5 (emphasis in original). *See also Spiegel v. Sharp Elecs. Corp.*, 466 N.E.2d 1040, 1044 (Ill. App. Ct. 1984) ("law of Illinois is that third-party beneficiary status may only be conferred where the identification of the third party to be benefited is clear and the benefit to him is direct"). He has not, nor has he alleged the Product was anything but an off-the-shelf item sold through a middleman. *See Gurrola*, 774 F. Supp. 3d at 978.

McKenzie has thus failed to allege a breach of express or implied warranty.[10]

Finally, in the alternative to his breach-of-warranty claims, McKenzie alleges that Defendants were unjustly enriched. But "[u]nder Illinois law, unjust enrichment is not a separate cause of action." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011). And "when the plaintiff's particular theory of unjust enrichment is based on alleged fraudulent dealings and [a court] reject[s] the plaintiff's claims that those dealings, indeed, *were* fraudulent, the theory of unjust enrichment that the plaintiff has pursued is no longer viable." *Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007). Such is true here, and so the unjust enrichment claim is dismissed accordingly.

## IV.     Conclusion

For the foregoing reasons, the motion to dismiss is granted but dismissal is without prejudice.

Enter: 25-cv-1768
Date:   March 6, 2026

_____
Lindsay C. Jenkins

---

[10]     Plaintiffs must also "provide notice to a putative defendant before filing suit," *Rudy v. D.F. Stauffer Biscuit Co.*, 666 F. Supp. 3d 706, 720 (N.D. Ill. 2023), except where a seller has "actual knowledge of the alleged breach of the particular products purchased by the named plaintiffs in this lawsuit." *Raya*, 758 F. Supp. 3d at 834 (N.D. Ill. 2024) (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 590 (Ill. 1996)). Defendants do not make the argument, but it seems doubtful that McKenzie can establish Defendants' actual knowledge of the claims, since he concedes that he did not provide pre-suit notice. [*See* Dkt. 41, ¶¶ 276, 303.] The Illinois Supreme Court has held that the requisite notice is "not of the facts … but of *buyer's claim* that they constitute a breach." *Connick*, 675 N.E.2d at 590 (holding also that "even if a manufacturer is aware of problems with a particular product line, … manufacturer [must] somehow [be] apprised of the trouble with the particular product purchased by a particular buyer"). *See also Anthony v. Country Life Mfg.*, LLC., 70 F. App'x 379, 384 (7th Cir. 2003) (rejecting application of exception where defendant "knew that its products contained stevia and cholecaliciferol it therefore knew of the defect," but did not know of plaintiff's claim). McKenzie does not allege that Defendants knew of his particular transaction, only "of the defects present in each of the Vapable Oils when they were sold." [Dkt. 41, ¶ 272.] And even this theory strikes the court as flimsy, given that the defect itself depends entirely on an interpretation of law—one that McKenzie, except in conclusory fashion, does not allege Defendants ever contemplated. Still, without briefing, the court cannot say with certainty that amending would be futile, so the dismissal is without prejudice. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 518 (7th Cir. 2015).